IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRYCE FINGER,** | ) |
| | ) |
| **ESTELLE WILSON,** | ) |
| | ) |
| **WILFRED LYNCH,** | ) |
| | ) |
| **LANCE LYNCH,** | ) |
| | ) |
| **BRYATT FINGER,** | ) |
| | ) |
| **RASHANN FINGER,** | ) |
| | ) |
| **ALETTA WHITE, individually, and as the legal** | ) |
| **representative of the ESTATE OF FRANS** | ) |
| **ROBERT BRAND,** | ) |
| | ) **Case No. 1:23cv927** |
| **SHEÁ BRAND,** | ) |
| | ) |
| **ROBERT BRAND,** | ) **JURY TRIAL DEMANDED** |
| | ) |
| **and** | ) |
| | ) |
| **ADRI DU PREEZ, as the legal representative** | ) |
| **of the ESTATE OF IGNATIUS DU PREEZ,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ISLAMIC REPUBLIC OF IRAN** | ) |
| **Serve: Foreign Minister Hossein Amir Abdollahian** | ) |
|     **Ministry of Foreign Affairs** | ) |
|     **Khomeini Avenue** | ) |
|     **United Nations Street** | ) |
|     **Tehran, Iran** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

NOW COME the Plaintiffs, BRYCE FINGER, ESTELLE WILSON, WILFRED

LYNCH, LANCE LYNCH, BRYATT FINGER, RASHANN FINGER, ALETTA WHITE,

individually, and as the legal representative of the ESTATE OF FRANS ROBERT BRAND, SHEÁ BRAND, ROBERT BRAND, and ADRI DU PREEZ, as the legal representative of the ESTATE OF IGNATIUS DU PREEZ (collectively referred to herein as "Plaintiffs"), by counsel, and file this Complaint against Defendant, the Islamic Republic of Iran ("Iran"). This case arises out of terrorist attacks targeting American interests in the Republic of Iraq ("Iraq"), carried out as a result of Iran's manufacture and widespread distribution of explosively formed penetrators ("EFPs"). In support of their claim, Plaintiffs state as follows:

## I.    THE PARTIES

1.      Bryce Finger was injured in a May 24, 2007 EFP attack. He is a citizen of the United States.

2.      Estelle Wilson is the mother of Bryce Finger and a citizen of the United States.

3.      Wilfred Lynch is the father of Bryce Finger and a citizen of the United States.

4.      Lance Lynch is the brother of Bryce Finger and a citizen of the United States.

5.      Bryatt Finger is the brother of Bryce Finger and a citizen of the United States.

6.      Rashann Finger is the brother of Bryce Finger and a citizen of the United States.

7.      Frans Robert Brand was killed in an August 28, 2007 EFP attack. Aletta White is the legal representative of the Estate of Frans Robert Brand.

8.      Aletta White is the sister of Frans Robert Brand and a citizen of the Republic of South Africa.

9.      Sheá Brand is the daughter of Frans Robert Brand and a citizen of the Republic of South Africa.

10.     Robert Brand is the father of Frans Robert Brand and a citizen of the Republic of South Africa.

11.     Ignatius du Preez was killed in a November 14, 2005 EFP attack. Adri du Preez is the legal representative of the Estate of Ignatius du Preez.[1]

12.     Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II.     JURISDICTION AND VENUE

13.     Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

14.     Despite its status as a foreign state, Iran is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due both to Iran's longstanding designation as a "State Sponsor of Terrorism" and to its specific provision of material support for the commission of the terrorist acts alleged within this Complaint.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

16.     At the time of the attacks alleged herein, Bryce Finger, Frans Robert Brand, and Ignatius du Preez (collectively, the "Attack Victims") were all either citizens of the United States of America or were performing a contract awarded by the United States Government and acting within the scope of that performance.

---

[1] Adri du Preez, in her individual capacity, is a plaintiff in a related action pending before this Court. *Strauss v. Islamic Republic of Iran*, Case No. 1:22cv52. Therein, she seeks solatium damages arising out of the same November 14, 2005 attack at issue here.

### III.      NATURE OF THE ACTION

17.      Following the overthrow of Saddam Hussein in 2003, Iran perceived the continued presence of United States personnel within Iraq as a threat. In response, Iran began a substantial covert effort to undermine American efforts in Iraq and increase the cost of those efforts, both financially and in terms of human lives, with the goal of ultimately forcing America's withdrawal from the region. Iran primarily relied upon Iraq's various Shia militias to carry out the violent aspects of this plan. The most successful part of that strategy was Iran's manufacture and provision of EFPs to these militia groups. The detonation of Iranian-made EFPs in Iraq killed hundreds of American military personnel and contractors, and wounded thousands more. Included among those many casualties were the Attack Victims.

18.      The provision of EFPs to Shia militias within Iraq was part of a broader conspiracy between Iran and its proxy forces, such as the Shia militias, to attack American interests throughout the Middle East with violent acts of terrorism.

19.      By knowingly and intentionally providing material support and resources, such as EFPs, for the express purpose of enabling and encouraging acts of terrorism, Iran is liable for the damages suffered by the Attack Victims and their family members, as a direct and proximate result of the various EFP attacks alleged herein.

### IV.      FACTUAL ALLEGATIONS

#### A.      <u>Iran's Substantial & Pervasive Support for International Terrorism</u>

20.      Ever since the Iranian revolution in 1979, Iran has engaged in and provided material support towards acts of terrorism as an instrument of its foreign policy.

21.      Its primary means of providing this support is through long-term proxy relationships with militia groups, political parties, and terrorist organizations in various countries

throughout the Middle East. Iran's widespread support for groups willing to commit acts of terrorism, such as Hezbollah,[2] is well-documented, as is Iran's sponsorship of a wide variety of Shia militia groups in Iraq.

22.     On January 19, 1984, Iran was officially designated as a state sponsor of international terrorism under the Export Administration Act of 1979, 50 U.S.C. § 2405(j) and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b). That designation has persisted at all times relevant to this case.

23.     Iran carries out its support of terrorism, in large part, through the Islamic Revolutionary Guard Corps ("IRGC"), a military force that operates in parallel to the conventional Iranian military. The IRGC is supervised by the Iranian Parliament but operates as an agent and instrumentality of the Supreme Leader of Iran, Ayatollah Ali Hoseini Khamenei. The IRGC also has a constitutional role as the defender of the Islamic Revolution.

24.     The Supreme Leader serves as commander in chief of the armed forces, appoints the head of each military branch, declares war and peace, appoints the head of the judiciary, and may dismiss the elected president of Iran at any time. The IRGC and its agencies are subsidiaries of Iran and act on behalf of Iran.

25.     The IRGC also owns or controls hundreds of companies, particularly those in the oil and gas, engineering, telecommunications, and infrastructure sectors, and holds billions of dollars in military business and other government contracts.

26.     On April 15, 2019, the IRGC was formally designated by the U.S. State Department as a Foreign Terrorist Organization.

---

[2] Transliteration of the names for foreign organizations has produced various spellings. For ease of reference, "Hezbollah" is used herein, except where an alternate spelling is reflected in a quoted document or case.

27.     The IRGC has a special foreign division, known as the Quds Force ("IRGC-QF"), which is the branch of the IRGC primarily used to promote and support terrorism abroad. The IRGC-QF has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing. It is one of the most organized, disciplined, and deadly organizations in the world.

28.     The IRGC-QF provides funding and training for terrorism operations targeting American citizens, including support for groups like Hezbollah, and certain Shia militia groups in Iraq. These activities are known and sanctioned by Iran's Supreme Leader and are an official part of Iran's foreign policy.

29.     Accordingly, pursuant to Executive Order 13224, the Treasury Department has designated the IRGC-QF as a "terrorist organization" and the State Department has designated the IRGC-QF as a "foreign terrorist organization." In October 2007, the IRGC-QF was designated as a Specially Designated Global Terrorist due to its provision of "lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

30.     Iran also supports terrorism through its Ministry of Information and Security ("MOIS"), which is an intelligence agency with an annual budget of between $100 million and $400 million. Like the IRGC-QF, MOIS has been involved in kidnappings, assassinations, and other acts of terrorism since its inception.

**B.      Growing Conflict and Tension in Iraq**

31.     The religion of Islam is primarily split between two sects, Shia and Sunni. Despite many similarities, key differences in doctrine, law, and theology between these sects have caused centuries of political and military conflict throughout the Middle East.

32.     Sunnis make up approximately eighty-seven to ninety percent of Muslims worldwide.

33.     The nations of Egypt, Saudi Arabia, and Jordan, among others, are overwhelmingly populated by Sunni Muslims.

34.     Iran is overwhelmingly populated by Shia Muslims.

35.     Iraq, positioned between these two regions geographically, is comprised of a unique mix of approximately forty percent Sunni and sixty percent Shia.

36.     On February 11, 1979, the Islamic Revolution in Iran succeeded in overthrowing the monarchy, providing Shia cleric Ayatollah Khomeini the opportunity to implement a Shia theocracy in Iran.

37.     Several months later, Saddam Hussein, a Sunni, became the leader of Iraq.

38.     Before long, tensions between these neighboring rulers boiled over and the Iran-Iraq War began in September 1980. This conflict endured until 1988.

39.     Under the rule of the Ayatollah, Iran sought to create a Shia revival throughout the Middle East region and implemented a foreign policy of supporting Shia militias, uprisings, and political organizations operating within its neighbors, including many inside Iraq.

40.     One example of these efforts was the Badr Brigade, which was formed in 1983 by Shia exiles from Iraq, with direct assistance and support from the IRGC. The Badr Brigade was supplied and trained by, and fought alongside, the IRGC throughout the Iran-Iraq War.

41.     After the Iran-Iraq War, the Badr Brigade continued to receive IRGC support for its ongoing efforts to oppose the rule of Saddam Hussein through various means, including the smuggling of people and weapons into Iraq from Iran. Until the Coalition invasion of Iraq in 2003, the Badr Brigade operated as Iran's surrogate in Iraq, a *de facto* arm of the IRGC-QF.

42.     Throughout this period, the IRGC, the IRGC-QF, and/or Hezbollah, an Iranian proxy acting on Iran's direction, trained the Badr Brigade and its leaders in insurgency and terrorist tactics, including the use of roadside explosives.

43.     On March 19, 2003, a Coalition army, led primarily by the United States, invaded Iraq and ended the reign of Saddam Hussein. The invasion was largely complete within one month and attempts to rebuild and reconstruct the country began almost immediately.

44.     The Coalition Provisional Authority ("CPA"), a transitional government in Iraq, began operating in May 2003 with the goal of providing stable governance, promoting the development of a functional democracy, and reconstructing key infrastructure.

45.     The Iraqi Interim Government took over from the CPA on June 28, 2004 and was replaced by the Iraqi Transitional Government on May 3, 2005. The first permanent government began when Nouri al-Maliki took office as Prime Minister on May 20, 2006.

46.     During these transitional periods, various political parties and militia groups vied for power, influence, and control over the new government.

**C.     The Rise of Iranian-Sponsored Shia Militias in Iraq**

47.     Iran, through the IRGC-QF and Hezbollah, has played a primary role in establishing, supporting, training, and supplying several violent Shia militia groups in Iraq for the express purposes of increasing its own political, cultural, and economic influence within Iraqi society and undermining American efforts in the region.

48.     In January 2007, Gen. Michael Hayden, director of the CIA, testified before Congress that "there's a clear line of evidence that points out the Iranians want to punish the United States, hurt the United States in Iraq, tied down the United States in Iraq, so that our other options in the region, against other activities the Iranians might have, would be limited."

49.     In 2010, the United States ambassador to Iraq, James Jeffrey, stated in an interview that Iranian-supported Shia militias and insurgent groups may have been responsible for up to one quarter of all United States combat casualties in Iraq.

50.     By supplying weaponry and training to proxy militia organizations such as the Badr Organization, Jaysh al-Mahdi, Asaib Ahl al-Haq, and Kata'ib Hezbollah (collectively, the "Proxy Militias"), Iran was able to consistently inflict lethal damage upon American forces without risking direct military confrontation.

51.     As summarized by the U.S. Army's own comprehensive report about the Iraq War, "the Iranian regime was content to fund, train and supply all parties willing to attack the U.S.-led coalition."

         i.      *The Badr Organization*

52.     The Badr Brigade, and its corresponding political wing, the Supreme Council for the Islamic Revolution in Iraq ("SCIRI"), publicly returned to Iraq after the fall of Saddam Hussein. Because of their longstanding opposition to Saddam Hussein, both groups were welcomed as participants in a new and inclusive Iraqi government.

53.     In order to appear less militant in its approach, the SCIRI renamed the Badr Brigade as the Badr Organization of Reconstruction and Development ("Badr Organization") and later renamed itself as the Supreme Islamic Iraqi Council.

54.     During the early years of the CPA, Interim, and Transitional governments, the leaders of the SCIRI and the Badr Organization became increasingly involved in Iraq's developing political structure.

55.     As a result of this political involvement, the SCIRI was given control over Iraq's Ministry of Interior, the government agency responsible for policing activities and border

enforcement. In April 2005, a former Badr Brigade commander was appointed to serve as the head of this agency.

56.     Despite its rise to public and political prominence in Iraq, the Badr Organization continued to receive guidance, training, weapons, and funding from Iran through the IRGC, the IRGC-QF, and/or Hezbollah.

57.     As early as July 2003, mere months after the invasion of Iraq, a Badr Corps commander received forty-million dollars from Iran for the express purpose of organizing the logistics network necessary to smuggle weapons to Shia militants. This commander, Abu Mustafa al-Sheibani, was instrumental in organizing the first EFP distribution networks.

            ii.     *Jaysh al-Mahdi*

58.     Muqtada al-Sadr is a prominent Iraqi Shia cleric. His father, Ayatollah Muhammad Sadiq al-Sadr, was an exalted Shia figure in Iraq who openly opposed Saddam Hussein's rule.

59.     Sadiq al-Sadr built a movement, the "Sadrist Movement," with the goal of restoring Shia Islam's relevance to the spiritual and sociopolitical needs of Iraqis.

60.     In 1991, after the United States expelled the Iraqi army from Kuwait, the Shia population revolted against Saddam Hussein, anticipating assistance from the United States which never materialized. Thereafter, Sadiq al-Sadr became overtly hostile to the United States.

61.     Sadiq al-Sadr and two of his sons were killed in 1999 and Muqtada al-Sadr assumed leadership over the Sadrist Movement. His popular appeal in the years that followed stemmed from his family name, Shia-based nationalism, and anti-American sentiment.

62.     Almost immediately after the Coalition's invasion of Iraq, in June 2003, Muqtada al-Sadr formed the Mahdi Army, also referred to as Jaysh al-Mahdi ("JAM"). JAM quickly

became the largest Shia militia in Iraq. Iran, from the very beginning, recognized the opportunity to capitalize on this popular movement.

63.     Thousands of JAM fighters travelled to Lebanon for extensive training with Hezbollah operatives beginning in 2003. This relationship was encouraged and facilitated by Iran through the IRGC and IRGC-QF.

64.     On April 18, 2004, JAM initiated the first major armed confrontation against Coalition forces in Iraq by the Shia community.

65.     The U.S. State Department, in its April 27, 2005 Country Reports on Terrorism, stated that "Iran provided funding, safe transit, and arms to insurgent elements [within Iraq], including Muqtada al-Sadr's forces."

66.     The IRGC-QF also provided advisors in Iraq for JAM and its progeny in the construction, maintenance, and use of advanced weaponry.

67.     On November 10, 2005, two JAM members were taken into custody near the Iranian border and admitted to trafficking explosives from Iran.

68.     On November 28, 2006, a JAM commander met with Iranian officials at the Iraq-Iran border to pick up three shipments of rockets.

69.     In December of 2006, JAM planned to attack and kidnap United States soldiers who were travelling in Humvee convoys. The plan was to use improvised explosive devices and small arms fire to carry out the attacks. Any resulting captives were to be taken to Sadr City and held there to deter American raids. The person chosen to plan the operation, Shaykh Azhar al-Dulaimi ("Dulaimi"), was trained in Iran by Hezbollah, under the supervision of the IRGC-QF, on how to conduct precision military style kidnappings.

70.     In 2008, Iran provided JAM leaders and fighters with support and refuge in response to territorial gains by Coalition forces.

71.     On July 2, 2009, the Treasury Department issued a press release announcing that it had designated Abu Mahdi al-Muhandis under Executive Order 13438 as threatening the peace and stability of Iraq and its government.

72.     The Treasury Department press release further outlined JAM's terrorist activities and relationship with Iran through Abu Mahdi al-Muhandis. The release stated:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces.
>
> . . .
>
> In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad.
>
> . . .
>
> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improved

explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

73.     Throughout the years, JAM also served as the parent organization for smaller and more radical groups with direct ties to Iran. These groups were identified by the American military as JAM "Special Groups."

> iv.     *Asaib Ahl al-Haq*

74.     Asaib Ahl al-Haq ("AAH") was founded by Qais Khazali at the suggestion of, and with the direct support, knowledge, and guidance from, Ayatollah Khomeini and IRGC-QF commander Qasem Soleimani.

75.     Iran provided AAH with millions of dollars monthly and trained its fighters in modern urban warfare tactics. By 2006, "AAH was clearly the most powerful of what was called the Special Groups." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 63 (D.D.C. 2018).

76.     At Iran's direction, "Hezbollah created a unit whose sole purpose was to train Iraqi Shia militants, including AAH, to carry out attacks in Iraq directed at U.S. troops and others." *Fritz*, 320 F. Supp. 3d at 63 (internal quotation marks omitted).

77.     One such attack occurred in 2007, when AAH kidnapped and executed five American soldiers from the Provincial Joint Coordination Center in Karbala, Iraq. Based on a wide variety of compelling evidence, this Court found that "Iran assisted AAH in planning and executing the Karbala attack." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d at 72.

78.     On January 3, 2020, AAH was designated as a Foreign Terrorist Organization by the U.S. State Department for its use of "violence and terror to further the Iranian regime's efforts to undermine Iraqi sovereignty."

*v.*      *Kata'ib Hezbollah*

79.      Jamal Jaafar Ibrahimi, more commonly known as Abu Mahdi al-Muhandis, was a leader of the Badr Corps during the Iran-Iraq War. He left that role sometime after the Coalition invasion of Iraq and founded Kata'ib Hezbollah in approximately 2007 with direct assistance and support from Iran.

80.      Qasem Soleimani, the IRGC-QF commander, was a known personal advisor of Kata'ib Hezbollah and al-Muhandis. At Iran's direction, instructors from Lebanese Hezbollah were employed in training members of Kata'ib Hezbollah.

81.      Special Groups led by al-Muhandis, including Kata'ib Hezbollah, transported EFPs from Iran to Iraq for widespread distribution.

82.      In April 2008, al-Muhandis facilitated the transport of trucks containing, among other weapons, EFPs, from Iran into Baghdad.

83.      In August 2008, four hard drives were seized from a storage facility associated with Kata'ib Hezbollah. These drives contained approximately 1,200 videos of planning and executing attacks against American-led forces, including the use of EFPs.

84.       On July 2, 2009, Kata'ib Hezbollah was designated as a Foreign Terrorist Organization by the U.S. State Department.

**D.**      **Iran's EFP Proxy Campaign in Iraq**

85.      After the fall of Saddam, Iran's intentions in Iraq came into focus quickly for those on the ground. By May 2006, Lieutenant General Peter W. Chiarelli had already observed that "[t]he Government of Iran is pursuing a multi-faceted, interventionist policy in Iraq" and "the primary purpose of their activities is to ensure that Iraqi policy is determined by a relatively weak, pro-Iranian, Shia-dominated, Islamist government [and t]he secondary purpose is to either

accelerate the withdrawal of Coalition Forces or, perhaps, to keep us tied up here and 'bleed us white'."

86.     The most lethal weapon in this Iranian campaign was the EFP.

87.     Before the introduction of the EFP into Iraq, roadside bombs, often referred to generally as improvised explosive devices ("IED"), were largely ineffective against the sophistication of American armored vehicles, personnel carriers, and tanks.

88.     By contrast to the rudimentary nature of an IED, an EFP is a complex shaped-charge explosive that requires the careful milling of a concave copper plate. When the device detonates, this concave plate transforms into a molten copper slug travelling at several times the speed of sound. Based on this design, the slug from an EFP can penetrate the armor of almost all vehicles, even the technologically advanced M1 tank.

89.     This same basic EFP design was first used against the Israeli military by Lebanese Hezbollah as early as 1998. When the first EFP detonations occurred in Iraq in 2004, they were immediately recognized as essentially the same weapon.

90.     Iran delivered large numbers of EFPs to the Proxy Militias through multiple Iraqi EFP networks by sponsoring training in Iran, Iraq, and Lebanon, and facilitating the movement of personnel and equipment between Iran and Iraq.

91.     In 2006, American troops intercepted a shipment of crates containing the copper plates needed to construct EFPs. The plates were already milled, ready for assembly, and the U.S. military discovered that each plate had been turned on the same lathe in Iran. In this same shipment, cellular phones were seized that had previously been shipped to Iran.

92.     Once set-up and activated, the detonation of an EFP could be triggered manually, or by a passive infrared laser, like what is commonly used to prevent injuries with garage doors.

Activation was either accomplished manually or via cellular signals. Later iterations of EFPs became more advanced, some even using the electronic signal jammers deployed by Coalition forces as the ultimate triggering mechanism. Iran's assistance was instrumental in refining the design of EFPs, and updating the training for those deploying them, in order to maintain the weapon's lethality despite sophisticated American countermeasures.

93.     In 2007, the State Department's Country Reports on Terrorism stated that:

> Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program.

94.     In the first half of 2007, at least ten Iranian helicopter incursions into Iraq were detected along known EFP smuggling routes. This supports the speculation of General Petraeus that "those routes are being reconnoitered to allow smugglers to avoid detection by border patrols and also to assess deployed Coalition Forces."

95.     In October 2007, American troops in Iraq discovered 280 at least partially assembled EFPs and more than 300 pounds of plastic explosives. This finding was particularly significant because the items bore January 2007 Iranian manufacturing labels.

96.     According to data released by the Pentagon, there were 1,534 EFP detonations impacting U.S. troops in Iraq between July 2005 and December 2011. These events led to the deaths of 196 soldiers and the wounding of another 861. Not included in these numbers are attacks against civilian contractors, such as the Attack Victims in this case.

97.     In a similar case, this Court has found Iran responsible for the "overwhelming majority" of EFP attacks in Iraq. *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 28–30 (D.D.C. 2019) ("[a]t a minimum, the metal, the HE explosive, and some degree of EFP manufacturing have each been attributed to Iran").

### E.     **The EFP Attacks**

98.     The Attack Victims were each targeted by at least one EFP attack while working in Iraq on behalf of the United States Government.

i.     *The November 14, 2005 EFP Attack*

99.     On November 14, 2005, a four-vehicle personal security convoy was en-route to the Ministry of Judges on Haifa Street in Baghdad.

100.    Ignatius du Preez ("Du Preez") was one of the passengers in the fourth vehicle.

101.    As the convoy passed the Iranian Embassy, an EFP detonated directly into the fourth vehicle, causing it to immediately burst into flames (the "November 14, 2005 EFP Attack").

102.    Four occupants of the fourth vehicle, including Du Preez, died as a result of the November 14, 2005 EFP Attack.

103.    Later, team members were informed by American military personnel that the attack was confirmed as an EFP incident due to the presence of copper residue at the scene. It was also reported that it was suspected this attack was orchestrated by Iranian embassy staff.

### ii.     The May 24, 2007 EFP Attack

104.    On May 24, 2007, a military convoy was traveling through Baghdad.

105.    Bryce Finger ("Finger") was the driver of the lead vehicle.

106.    During the convoy's route, the lead vehicle was struck on the right side by a sudden explosion (the "May 24, 2007 EFP Attack"). The blast severely damaged the lead vehicle, blowing off the rear cargo hatch.

107.    Finger, the driver, was struck with portions of the penetrating shrapnel in his left thigh and needed to be emergently evacuated for medical treatment.

108.    A subsequent military investigation at the scene determined that the explosive device used in the May 24, 2007 EFP Attack was an EFP. Copper shrapnel lodged in Finger's thigh confirmed this conclusion.

### iii.     The August 28, 2007 EFP Attack

109.    On August 28, 2007, Frans Robert Brand ("Brand") was part of a team tasked with identifying, transporting, and destroying enemy munitions in Iraq. He was employed and working as a security specialist for this team.

110.    During a convoy transport mission, Brand's vehicle was struck by an explosive device that penetrated the cabin, causing substantial damage to the vehicle and its occupants (the "August 28, 2007 EFP Attack").

111.    The explosion originated from at least one EFP device.

112.    Brand was killed as a result of the August 28, 2007 EFP Attack.

## V.      CAUSES OF ACTION

### <u>COUNT I – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE EXTRAJUDICIAL KILLING OF IGNATIUS DU PREEZ</u>
### (28 U.S.C. § 1605A(c))

113.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

114.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

115.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

116.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Du Preez, is an expected and welcomed result of those actions.

117.    Such conduct violates 28 U.S.C. § 1605A.

118.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

119.    The November 14, 2005 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

120.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Du Preez was killed in the November 14, 2005 EFP Attack.

121. At the time of the November 14, 2005 EFP Attack, Du Preez was acting within the scope of his employment under a contract awarded by the United States Government.

122. As a direct and proximate result of Iran's actions, the Estate of Ignatius du Preez has suffered significant economic damages.

123. Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT II – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF BRYCE FINGER
### (28 U.S.C. § 1605A(c))

124. Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

125. At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

126. Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

127. As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American military personnel, such as Finger, is an expected and welcomed result of those actions.

128. Such conduct violates 28 U.S.C. § 1605A.

129.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

130.    The May 24, 2007 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

131.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Finger was injured in the May 24, 2007 EFP Attack.

132.    At the time of the May 24, 2007 EFP Attack, Finger was a United States citizen and an active-duty member of the American military.

133.    As a direct and proximate result of the May 24, 2007 EFP Attack, Finger experienced and continues to experience pain and suffering, disability, physical limitations, emotional and psychological trauma, including PTSD, and economic losses.

134.    As a direct and proximate result of Iran's actions, Estelle Wilson, Lance Lynch, Bryatt Finger, Rashann Finger, and Wilfred Lynch have experienced significant solatium damages.

135.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT III – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE EXTRAJUDICIAL KILLING OF FRANS ROBERT BRAND
### (28 U.S.C. § 1605A(c))

136.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

137.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

138.    Iran provided material support and resources to the Proxy Militias for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Proxy Militias, including violent attacks against United States personnel and interests.

139.    As such, Iran's provision of material support and resources to the Proxy Militias was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Brand, is an expected and welcomed result of those actions.

140.    Such conduct violates 28 U.S.C. § 1605A.

141.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

142.    The August 28, 2007 EFP Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the intent to bring about injuries and/or death to United States soldiers and contractors.

143.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Brand was killed in the August 28, 2007 EFP Attack.

144.    At the time of the August 28, 2007 EFP Attack, Brand was acting within the scope of his employment under a contract awarded by the United States Government.

145.    As a direct and proximate result of Iran's actions, the Estate of Frans Robert Brand has suffered significant economic damages.

146.    As a direct and proximate result of Iran's actions, Aletta White, Sheá Brand, and Robert Brand have experienced significant solatium damages.

147.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Proxy Militias, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

148.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

149.     This Court has subject matter jurisdiction over this Count pursuant to 28 U.S.C. 1605A(a) because EFP attacks constitute acts of terrorism, Iran is a designated state sponsor of terrorism, and the Attack Victims were either nationals of the United States or performing a contract awarded by the United States Government at the time of the attacks.

150.     The immediate family members of the Attack Victims consist of Estelle Wilson, Lance Lynch, Bryatt Finger, Rashann Finger, Wilfred Lynch, Aletta White, Sheá Brand, and Robert Brand (collectively referred to herein as the "Family Member Plaintiffs").

151.     The Proxy Militias' use of EFPs to commit acts of terrorism against the Attack Victims was intentional and reckless, extreme and outrageous, and caused the Family Member Plaintiffs to experience severe emotional distress.

152.     The detonation of EFPs by the Proxy Militias violated acceptable norms of humane treatment under the laws of the United States and the acceptable norms of international law by which all civilized nations transact their affairs.

153.     These acts of terrorism were extreme and outrageous, perpetrated with the intent to intimidate and coerce.

154.    Iran, through its influence with the Proxy Militias, knowingly and willfully provided material support, training, and direction to these acts of terrorism, with the express purpose of causing severe injury or death to the victims of the attacks and intimidating others.

155.    Iran knew, or reasonably should have known, that these terrorist acts would cause severe emotional distress to the family members of those who were attacked.

156.    Therefore, Iran is responsible for the damages suffered by the Family Member Plaintiffs as a direct and proximate result of the EFP attacks on the Attack Victims.

157.    Because Iran acted in a willful and wanton manner, showing a conscious disregard for the rights of others, the Family Member Plaintiffs request an additional award of punitive damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs against Iran on all Counts, and grant Plaintiffs:

For the Estate of Ignatius du Preez, on Count I, the following:

    a.  Compensatory damages for the death of Ignatius du Preez, including pain and suffering and economic damages, to the Estate of Ignatius du Preez, in the amount of $20,000,000, or a sum certain to be determined at trial;

    b.  Punitive damages in the amount of twice the compensatory damages awarded;

    c.  Interest, from November 14, 2005 until the date of judgment; and

    d.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Finger Family, on Counts II and IV, the following:

    a.  Compensatory damages for the damages to Bryce Finger, including pain and suffering and economic losses, in the amount of $20,000,000, or a sum certain to be determined at trial;

b.  Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $35,000,000, comprised of the following sums:

- $10,000,000 on behalf of Estelle Wilson, mother of Bryce Finger;
- $10,000,000 on behalf of Wilfred Lynch, father of Bryce Finger;
- $5,000,000 on behalf of Lance Lynch, brother of Bryce Finger;
- $5,000,000 on behalf of Bryatt Finger, brother of Bryce Finger;
- $5,000,000 on behalf of Rashann Finger, brother of Bryce Finger;

c.  Punitive damages in the amount of twice the compensatory damages awarded;

d.  Interest, from May 24, 2007 until the date of judgment; and

e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Brand Family, on Counts III and IV, the following:

a.  Compensatory damages for the death of Frans Robert Brand, including pain and suffering and economic damages, to the Estate of Frans Robert Brand, in the amount of $20,000,000, or a sum certain to be determined at trial;

b.  Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $25,000,000, comprised of the following sums:

- $10,000,000 on behalf of Sheá Brand, daughter of Frans Robert Brand;
- $10,000,000 on behalf of Robert Brand, father of Frans Robert Brand;
- $5,000,000 on behalf of Aletta White, sister of Frans Robert Brand;

c.  Punitive damages in the amount of twice the compensatory damages awarded;

d.  Interest, from August 28, 2007 until the date of judgment; and

e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Dated: April 5, 2023                         Respectfully submitted,

       /s/ Kevin A. Hoffman_____
Randy D. Singer (DCD Bar No. VA057)
Kevin A. Hoffman (DC Bar No. 1044559)
Maryam M. Atty (DCD Bar No. VA137)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: randy.singer@singerdavis.law
Email: kevin.hoffman@singerdavis.law
Email: maryam.atty@singerdavis.law
*Counsel for Plaintiffs*