UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**BRYCE FINGER**, *et al.*

    *Plaintiffs,*

v.

**ISLAMIC REPUBLIC OF IRAN**,

    *Defendant.*

Case No. 1:23-CV-927 (RCL)

### MEMORANDUM OPINION

This case arises from two terrorist attacks in Iraq, both involving "explosively formed penetrators"—a type of improvised explosive device designed to attack modern armored vehicles. The plaintiffs seek to recover damages from the Islamic Republic of Iran for its involvement in helping the paramilitary groups that perpetrated these attacks.

Two sets of plaintiffs have brought the motion pending before the Court: (1) the estates of military contractors who were killed in these attacks (the "Contractor Plaintiffs"), and (2) the immediate family members of one of those victims (the "Brand Family Plaintiffs"). Since Iran has failed to appear, default has been entered, and these plaintiffs now move for default judgment on liability only. They bring claims under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA") and South Africa tort law. For the reasons given below, the plaintiffs' motion for default judgment on liability is **GRANTED**.

### I.    PROCEDURAL HISTORY

The Contractor Plaintiffs and the Brand Family Plaintiffs filed this suit on April 5, 2023. ECF No. 1. As discussed in more detail below, the plaintiffs successfully served Iran through diplomatic channels in October 2023. ECF Nos. 14, 16; *see* 28 U.S.C. § 1608(a)(4). The plaintiffs

1

received notice of service on Iran in November 2023. ECF No. 16. After Iran failed to respond to the complaint and upon the plaintiffs' request, the Clerk of Court entered Iran's default. Affidavit for Default, ECF No. 17; Entry of Default, ECF No. 20. The plaintiffs now move for default judgment, saving the question of damages for a later date. ECF No. 21.

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 55(a) requires the Clerk of the Court to enter a party's default when the party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." But even when a defendant fails to appear, "the entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). The FSIA provides that "[n]o judgment by default shall be entered . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).

The evidentiary showing needed to satisfy the default-judgment standard under § 1608(e) "can be less than that normally required." *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citation omitted), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). In fact, "the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)). As a corollary, the FSIA "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens*, 864 F.3d at 785. Rather, the core requirement of § 1608(e) is that courts may not "simply accept a complaint's unsupported allegations as true." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).

2

### III.     FACTUAL BACKGROUND

Courts may look to "numerous evidentiary sources" when considering whether the plaintiffs have satisfied the default-judgment standard—including documentary, testimonial, and affidavit evidence.  *Id.*  In addition, the Court may "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced." *Id.* at 172; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010).  Here, the plaintiffs rely heavily on judicial notice in support of their motion for default judgment.

### A. Judicial Notice

Courts may take judicial notice of facts established in prior related cases because such facts are "not subject to reasonable dispute" since they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  "This rule permits courts to take judicial notice of court records in related proceedings." *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012).  But before this Court can enter default judgment, it must "reach its own, independent findings of fact" notwithstanding prior cases implicating the same issues.  *Rimkus*, 750 F. Supp. 2d at 172.

Here, the plaintiffs ask the Court to rely extensively on evidence from three previous cases in this district.  *See* Pls.' Mem. Supp. Mot. Default J. ("Mem. Supp."), ECF No. 21-2.  Two of these cases involve one of the two attacks at issue here.  *Roberts v. Islamic Republic of Iran* ("*Roberts I*"), 581 F. Supp. 3d 152, 163–64 (D.D.C. 2022) (Lamberth, J.); *Strauss v. Islamic Republic of Iran*, No. 22-cv-52 (RCL), 2025 WL 740456, at *5 (D.D.C. Mar. 7, 2025) (Lamberth, J.).  The third case, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019) (Kollar-Kotelly, J.), involved an extensive bench trial regarding Iran's connection to substantially similar attacks in Iraq.  While the Court cannot blindly accept any assertion made in these prior opinions,

the validity of the factual record in these cases is "not subject to reasonable dispute." Fed. R. Evid. 201(b). As this Court has often recognized, "the FSIA does not require this Court to relitigate issues that have already been settled." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009). So while the Court will conduct independent factfinding, it will not ignore the well-worn path charted by *Roberts I*, *Strauss*, and *Karcher*.

### B. Iran's Involvement in Iraq

Since the Iranian Revolution of 1979, the Islamic Revolutionary Guard Corps (IRGC) and its subsidiary Qods Force have served under the direct supervision of the Iranian government's theocratic Supreme Leader. *See Karcher*, Expert Report of Russell McIntyre ("McIntyre Report") at 4, ECF No. 88; *Karcher*, Expert Report of Michael Oats ("Oats Report") at 11, ECF No. 85. As an ongoing tenet of Iran's foreign policy, the Qods Force "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operations activities." *Karcher*, McIntyre Report at 6, ECF No. 88. Given these actions, the United States has designated Iran a state sponsor of terrorism since January 23, 1984. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836, 2836 (Jan. 23, 1984).

One early and well-documented example of Iran's support for terrorism abroad occurred in 1982, when the IRGC helped the Lebanese Shi'a community push the Israeli army out of Southern Lebanon by providing "critical assistance" to the newly emerging Hezbollah. *Karcher*, McIntyre Report at 7, ECF No. 88. In exchange for continuing fealty to Iran's regime, the IRGC funded, enabled, and supported Hezbollah's guerrilla attacks—such as the infamous 1983 bombing of the U.S. Marine Corps barracks in Beirut and the 1985 hijacking of TWA Flight 847 from Cairo to Athens. *Id.* at 8.

Iran used a similar model to great effect in Iraq. *Karcher*, Oats Report at 13–18, ECF No. 85. Taking advantage of the power vacuum created after the fall of Saddam Hussein's Sunni-led Ba'athist regime in 2003, Iran used the IRGC and Qods Force to help fill the power vacuum by funding, training, and arming Shi'a militias. *Id.* at 16. These militias became proxies of the IRGC and Qods Force, through which Iran pulled the strings. *See Karcher*, Transcript of Bench Trial, 12/03/2018, Tr. 120:19–22 (expert describing one group as a "proxy of the Qods Force" and not an "independent organization"), ECF No. 69; *id.* Tr. 123:22–25 (describing another group as a "whole-cloth creation of the IRGC").

Central to this case, Iran supplied these proxy militias with advanced roadside bombs known as explosively formed penetrators ("EFPs"). These devices were first developed in the 1990s by Hezbollah—which was in that era "the primary Iranian proxy group." Expert Affidavit of Donald Wade Barker ("Barker Aff.") ¶ 13, ECF No. 21-6. "EFP devices are highly effective against armored vehicles because of their ability to focus the energy of an explosive blast into a plate of [copper] metal, forming that metal into the shape of a slug." *Id.* ¶ 17. Upon detonation, this molten copper slug is "often the size of a bowling pin and traveling at twice the speed of a bullet" and can puncture an armored vehicle "like water through snow." STANLEY A. MCCHRYSTAL, MY SHARE OF THE TASK: A MEMOIR 426 n.252 (2013). "Inside the vehicle, the molten slug cut[s] through legs and torsos, and its heat often li[ghts] the cab and the men inside on fire." *Id.*

As many courts have recognized, EFPs "were a clear calling card of Iran-backed Shi'a militias." *Sibley v. Islamic Republic of Iran*, No. 23-cv-600, 2025 WL 1928036, at *8 (D.D.C. July 14, 2025); *Karcher*, 396 F. Supp. 3d at 21 (describing EFPs as "an Iranian 'signature weapon'" in the Iraqi theater). EFPs are difficult to construct, and countless experts have stated that militias

in Iraq would not have been able to construct EFPs without Iranian expertise. *See Karcher*, Oats Report at 24–25, ECF No. 85 ("[O]ne of Iran's primary forms of material support to the [militias] was financing, manufacturing and deploying EFPs. . . . The U.S. military traced much of the machinery used to manufacture the EFPs . . . to Iran and its illicit supply chain."); *Karcher*, Transcript of Bench Trial, 12/04/2018, Tr. 33:11–19, ECF No. 70 (explaining that only a "classically trained engineer" can build an EFP).

### C. The Attacks

Turning to the particular attacks at issue, both involve South African security contractors who were killed by EFPs while working for the United States military in Iraq. Affidavit of Aletta Truter ("Truter Aff.") ¶ 5, ECF No. 21-4; Affidavit of George Kieser ("Kieser Aff.") ¶¶ 4–5, ECF No. 21-5.

#### i. November 14, 2005 Attack

Ignatius du Preez was on the job as part of a personal security detail in Baghdad on November 14, 2005. Affidavit of Adri du Preez ("Du Preez Aff.") ¶ 2, ECF No. 21-3; *Roberts I*, Affidavit of Pierre du Plessis ("Du Plessis Aff.") ¶ 5, ECF No. 17-14. When his convoy passed in front of the Iranian embassy, an explosive device detonated and engulfed his vehicle in flames. *Roberts I*, Du Plessis Aff. ¶¶ 6–7, ECF No. 17-14. The attack killed Du Preez and three others traveling with him. *Id.* ¶ 10. According to Capt. Donald Wade Barker, an EFP expert who has appeared before this Court in similar cases, the wreckage from the attack showed the "telltale signs" of EFP damage based on the clean "circular penetration" that carried through the vehicle's armor. Barker Aff. ¶¶ 39, 41, ECF No. 21-6. Based on this evidence and the location of the attack, Barker concluded that the explosion "was caused by an EFP device" that was "designed,

6

manufactured, and distributed by" an Iranian-backed group. *Id.* ¶ 55; *see also Roberts I*, Affidavit of Donald Wade Barker ("*Robert I*, Barker Aff."), ECF No. 17-2.

### ii. August 28, 2007 Attack

Frans Robert Brand worked as a security specialist for a United States defense contractor; his duties involved "identifying, transporting, and destroying enemy weaponry in Iraq." *See* Truter Aff. ¶ 5, ECF No. 21-4; Keiser Aff. ¶ 4, ECF No. 21-5. On August 28, 2007, Brand was fatally injured after an explosive device ripped through his armored vehicle. *See* Truter Aff. ¶ 5, ECF No. 21-4. Photos of the wreckage show several "penetrations" that are all "from an EFP type slug." Barker Aff. ¶ 51, ECF No. 21-6. The largest penetration had "copper residue" lining it, and the hole "completely pierced the door despite the presence of two layers of armored steel." *Id.* ¶ 53. Given this evidence, Capt. Barker confirmed that the damage was "consistent with impact from an EFP device" armed with "multiple warheads." *Id.* ¶ 50. Given the technical expertise required to build a "multi-warhead EFP device," Capt. Barker concluded with "a reasonable degree of scientific certainty that this incident involved an EFP device that was designed, manufactured, and distributed by" an Iranian-backed group. *Id.* ¶¶ 55–56.

### D. The Plaintiffs' Status and Injuries

The Court now makes findings of fact regarding each plaintiff seeking default judgment, including the injuries that they have suffered.

### i. Estate of Ignatius du Preez

As mentioned, Ignatius du Preez died in an EFP attack while on duty as a security contractor for the United States government in Iraq. *See* Du Preez Aff. ¶ 2, ECF No. 21-3. As a result of his untimely death, his estate has suffered significant economic damages. *Id.* ¶ 7. His wife, Adri du Preez, is the legal representative of his estate. *Id.* ¶ 3.

### ii. Estate of Robert Brand

Much like Du Preez, Robert Brand was a citizen of South Africa who died in an EFP attack while on duty as a defense contractor for the United States government in Iraq. *See* Truter Aff. ¶ 5, ECF No. 21-4. Brand's estate "suffered economic damages" due to the "lost income" that resulted from his death. *Id.* ¶ 6. His younger sister, Aletta Truter, serves as the legal representative of his estate. *Id.* ¶ 3.

### iii. Aletta Truter

Aletta Truter is the youngest sister of Robert Brand. *Id.* at ¶ 2. She suffered "intense emotional distress" because of her brother's death. *Id.* ¶ 7. She and her brother had a "strong relationship" growing up and she describes him as the only "steadfast male figure" in her life. *Id.* ¶ 8. Robert was also a loving uncle to Aletta's son with whom Robert spent "as much time . . . as possible." *Id.* ¶ 12. After the attack, Robert and Aletta's mother relied heavily on her daughter for both emotional and financial support, which stunted Aletta's ability to process her own grief. *Id.* ¶ 20.

### iv. Sheá Brand

Sheá Brand is Robert Brand's daughter. Affidavit of Sheá Brand ("Sheá Brand Aff.") ¶ 2, ECF No. 21-7. Robert was killed when Sheá was five and she has since suffered "significant emotional distress" due to her father's death. *Id.* ¶¶ 4, 8. She remembers feeling a "profound sadness" at her father's funeral, even though she did not fully understand the concept of death at her young age. *Id.* ¶¶ 9–12. When she learned how her father died, she was overcome with rage and sorrow—a grief that she still carries "all these years later." *Id.* ¶¶ 12–14. Since her father's death, Sheá has struggled to maintain healthy interpersonal relationships and has lost contact with her father's side of the family. *Id.* ¶¶ 19–20.

### v. Frans Robert Brand Sr.

Frans Robert Brand, Sr. is Robert Brand's father. Affidavit Robert Brand, Sr. ("Brand, Sr. Aff.") ¶ 2, ECF No. 21-8. He had a "naturally close relationship bond" with his eldest and only son, who shared his name, and he relied on his son "both emotionally and financially." *Id*. ¶¶ 7–8. When Robert Sr. learned of his son's death, his "whole world came tumbling down," and he was overcome with emotion. *Id.* ¶ 13. He began to self-isolate, withdrawing from his family, community, and church. *Id.* ¶¶ 18–22. After suffering a crisis of faith and becoming estranged from some of his closest family, Robert Sr. today lives as a "hermit." *Id.* ¶¶ 21–22. Without the financial and practical help that his son used to provide, he has struggled significantly—particularly in his old age. *Id.* ¶¶ 21–24.

## IV. CONCLUSIONS OF LAW

### A. Subject Matter Jurisdiction

United States district courts "have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a). The plaintiffs brought this suit against Iran and now seek default judgment.[1] The only remaining question as to subject matter jurisdiction concerns whether Iran is entitled to sovereign immunity.

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). As relevant here, the FSIA's state-sponsored terrorism exception provides that a foreign state is not

---

[1] The plaintiffs initially demanded a trial by jury in their original and amended complaints, even though district courts only have original jurisdiction over "any *nonjury* civil action against a foreign state" in FSIA litigation. 28 U.S.C. § 1330(a) (emphasis added). The plaintiffs acknowledged their error in the motion for default judgment and withdrew their request for a jury trial. *See* ECF. No. 21-2 at 2.

entitled to immunity in suits where damages are sought against that state for materially supporting an extrajudicial killing. *See* 28 U.S.C. § 1605A(a)(1); *Fuld v. Islamic Republic of Iran*, No. 20-cv-2444 (RCL), 2024 WL 1328790, at *10 (D.D.C. Mar. 28, 2024). These conditions are met. To begin, the plaintiffs seek money damages against Iran for the deaths of Du Preez and Brand.[2] And these deaths were "extrajudicial killings" because they were deliberate killings that were "not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770–71 (citation omitted).

All that is left to overcome sovereign immunity is for the plaintiffs to prove that Iran's provision of material support caused the attacks. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). Proximate cause requires "some reasonable connection" between the defendant's act and the victim's injury. *Id.* (quoting PROSSER & KEETON ON THE LAW OF TORTS 263 (5th ed. 1984)). The requisite connection exists because the expert declarations in this and the judicially noticed cases indicate that Iran played a substantial factor in the sequence of events that led to the EFP attacks by providing Shi'a militia groups with the necessary materials and training; moreover, the resulting injuries were the foreseeable (and intended) consequences of supporting terrorism in Iraq. *See Owens*, 864 F.3d at 794 (identifying "substantial factor" and "reasonable foreseeab[ility]" as the two prongs of proximate cause). As explained in Part III.B *supra*, Iran has a long track record of facilitating terror attacks in Iraq, particularly by providing Shi'a militias with EFPs. In fact, the evidence connecting Iran to EFP attacks in Iraq is so overwhelming that courts in this district often presume that the "identification

---

[2] "[T]he FSIA does not restrict the personal injury or death element to injury or death suffered directly by the claimant; instead, such injury or death must merely be the basis of a claim for which money damages are sought." *Fuld v. Islamic Republic of Iran*, No. 20-cv-2444 (RCL), 2024 WL 1328790, at *10 (D.D.C. Mar. 28, 2024). So, for purposes of subject-matter jurisdiction, the Court need only consider the causal connection between Iran's conduct and the deaths of Du Preez and Brand. The Court will consider later on the causal connection between Iran's actions and the psychological injuries suffered by the Brand Family Plaintiffs. *See infra* Part IV.E.ii.

of the weapon as an EFP . . . necessitates the inference that Iran was responsible" "absent any indication" that an EFP attack "was *not* backed by Iran." *Karcher*, 396 F. Supp. 3d at 30; *see also, e.g.*, *Burks v. Islamic Republic of Iran*, No. 16-cv-1102, 2022 WL 20588923, at *3 (D.D.C. Sept. 30, 2022) (same). In keeping with these decisions, the Court finds a reasonable connection between Iran's actions and the plaintiffs' injuries.

Finally, there is yet one more statutory hurdle to the Court's subject-matter jurisdiction: even when the requirements of § 1605A(a)(1) are met, a court "shall hear a claim" only after finding that (i) the foreign country was designated a "state sponsor of terrorism at the time [of] the act"; (ii) "the claimant or the victim" was a "national of the United States; a member of the armed forces; or otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" at that time; and "in a case in which the act occurred in the foreign state against which the claim has been brought," (iii)  "the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A).

These requirements are easily satisfied.  Iran has been designated a state sponsor of terrorism since January 19, 1984.  *See* 49 Fed. Reg. at 2836.  Both Du Preez and Brand were victims of EFP attacks while on the job as contractors for the U.S. government in Iraq.  And the attacks at issue here took place in Iraq, which is not "the foreign state against which the claim has been brought," so there is no need for the plaintiffs to give Iran an opportunity to arbitrate.

### B.  Personal Jurisdiction

A court has "an independent obligation . . . to satisfy itself of its personal jurisdiction before entering a default judgment against a missing party." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018).  Under 28 U.S.C. § 1330(b), federal courts have

personal jurisdiction over a foreign state if (1) the court has subject matter jurisdiction under § 1330(a), and (2) the plaintiffs properly effectuate service under 28 U.S.C. § 1608. As explained above, the requirements for subject matter jurisdiction are met here. *Supra* IV.A. So the Court now considers whether plaintiffs satisfied the procedural requirements for service of process.

"The FSIA prescribes four valid methods of service, listed in order of preference." *Fuld*, 2024 WL 1328790, at *12. "If a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method available." *Id.* First, if possible, the plaintiff must make service pursuant to any "special arrangement" with the foreign state for service, if one exists. 28 U.S.C. § 1608(a)(1). Second, a plaintiff may serve the defendant state "in accordance with an applicable international convention" on service of process. *Id.* § 1608(a)(2). No special arrangement or international convention applies here, so neither option was available to the plaintiffs.

As such, the plaintiffs attempted the third preferred method of service, which requires mailing the requisite documents to Iran's foreign ministry. *See* ECF No. 11; *see* 28 U.S.C. § 1608(a)(3) (permitting service by having the Clerk of Court "address[] and dispatch[]" the complaint summons and notice of suit "to the head of the ministry of foreign affairs of the foreign state concerned"). After this failed, the plaintiffs resorted to the fourth and final service method: they served Iran through diplomatic channels, as permitted by § 1608(a)(4). *See* ECF No. 12. The Clerk mailed these documents on July 17, 2023. ECF No. 14. Iran was formally served by the U.S. State Department on October 11, 2023. ECF No. 16. Because the plaintiffs properly served the defendant in accordance with the FSIA, the Court may exercise personal jurisdiction over Iran.

### C. Timeliness

Actions under § 1605A "may be brought or maintained" only if filed "not later than" (1) "10 years after April 24, 1996," or (2) "10 years after the date on which the cause of action arose."

12

28 U.S.C. § 1605A(b).  Time limitations under the FSIA's state-sponsored terrorism exception "have long been treated as nonjurisdictional affirmative defenses that may be waived if not timely asserted by a defendant," and "the Court has no authority to enforce [such] limitations" if the issue is not raised.  *Fuld*, 2024 WL 1328790, at *13; *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019) ("We conclude that no such authority exists for a federal court to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant.").  Because Iran has not responded to this suit, the Court need not assess time bars here.

### D. Liability and Choice of Law

Finally, the Court will assess Iran's liability for the plaintiffs' injuries.  The plaintiffs have pleaded two sets of claims: (1) the Contractor Plaintiffs assert claims arising under § 1605A(c)'s private cause of action and (2) the Brand Family Plaintiffs assert common-law claims of intentional infliction of emotional destress.  The Court will assess each set of claims in turn.

#### i. Contractor Plaintiffs' § 1605A(c) Claims

The FSIA provides a private cause of action for victims of state-sponsored terrorism under 28 U.S.C. § 1605A(c)(3), which provides:

> A foreign state that is or was a state sponsor of terrorism . . . shall be liable to . . . an individual performing a contract awarded by the United State Government, acting within the scope of the employee's employment, . . . for personal injury or death caused by [the foreign state's provision of material support or resources for an extrajudicial killing] . . . for which the courts of the United States may maintain jurisdiction under this section for money damages.

 "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'"  *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86–87 (D.D.C. 2018) (alteration in original) (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 54 (D.D.C. 2018) (observing that "the elements of immunity and

13

liability . . . are essentially the same" (quoting *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010))).

But despite the overlap between the immunity and liability provisions of the FSIA, courts in this district still require an articulable "theory of liability," typically "through the lens of civil tort liability." *Pennington v. Islamic Republic of Iran*, No. 19-cv-796, 2021 WL 2592910, at *3 (D.D.C. June 24, 2021) (first quoting *Valore*, 700 F. Supp. 2d at 73, then quoting *Rimkus*, 750 F. Supp. at 175–76). This requirement proves simple in this case. Under basic tort principles, the Contractor Plaintiffs "may recover for their wrongful deaths if they can establish [that Iran] caused their deaths." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39 (D.D.C. 2016) (citing RESTATEMENT (SECOND) OF TORTS § 925 (Am. L. Inst. 1965)). As previously discussed, the plaintiffs have proven a sufficient causal link. *See supra* Part III.

In addition, the FSIA's federal cause of action may only be brought by claimants who are U.S. nationals, members of the U.S. armed forces, or U.S. government employees or contractors. *See* 28 U.S.C. § 1605A(c). Because Brand and Du Preez were on duty as contractors in service of the United States government at the time of their deaths and the decedents otherwise meet the requirements for recovery, their estates are entitled to federal statutory liability as a matter of law.

    ii.    **Brand Family Plaintiffs' South Africa Claims**

The contractors' foreign citizen family members, on the other hand, may not invoke § 1605A(c) since they do not fall into any of the categories of authorized claimants. But this does not mean that the Brand Family Plaintiffs cannot recover. Without the federal cause of action found in § 1605A(c), the FSIA operates as a "pass-through" for claims brought under the applicable state or foreign law. *Owens*, 864 F.3d at 763 (citation omitted); *W.A. v. Islamic Republic*

14

*of Iran*, 427 F. Supp. 3d 117, 138 (D.D.C. 2019) ("[T]he creation of a federal cause of action in § 1605A(c) did not revoke Plaintiffs' ability to recover pursuant to state law causes of action.").

"A federal court assessing state-law claims under the FSIA must apply the choice-of-law rules of the forum." *Roberts I*, 581 F. Supp. 3d at 173.  Federal courts apply the choice-of-law rules of the forum state or territorial jurisdiction where it sits to ascertain the relevant substantive law.  *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009).  So this Court applies the District of Columbia's choice-of-law rules.

D.C. law applies a "constructive blending" of "governmental interest" analysis and the "most significant relationship" test.  *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995); *see Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 40–41, 41 n.18 (D.C. 1989).  The governmental interest analysis turns on whether applying the law of a particular jurisdiction advances the policies underlying those laws.  *See In re APA Assessment Fee Litig.*, 766 F.3d 39, 51–52 (D.C. Cir. 2014).  Where multiple jurisdictions have policies that would be equally advanced, courts look to several factors to decide which jurisdiction has the "most significant relationship" to the occurrence and the parties.  *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013) (citations omitted).

This Court has previously considered this precise issue.  *Roberts I* involved emotional-distress claims brought by the foreign family members of U.S. government contractors killed by Iran-sponsored EFP attacks in Iraq.  *See* 581 F. Supp. 3d at 173–74.  After holding that D.C. choice-of-law principles did not compel the application of D.C. substantive law to these claims, the Court denied default judgment because the plaintiffs had failed to provide evidence of the potentially applicable foreign laws, meaning that this Court could not "determine which jurisdiction's law should govern."  *Id.* at 176.  But this did not spell the end for these foreign family members.  After

15

the plaintiffs satisfied their evidentiary burden, this Court concluded that while multiple jurisdictions had equally weighty policies, the jurisdictions with the most significant relationship to the case were the plaintiffs' "domicile countries," since this is "where they reside and where their injuries were felt." *Roberts v. Islamic Republic of Iran* ("*Roberts II*"), No. 20-cv-1227-RCL, 2023 WL 4351468, at *4 (D.D.C. July 5, 2023).

In this case, the Brand Family Plaintiffs are domiciliaries of South Africa. *See* Truter Affidavit ¶ 1, ECF No. 21-4; Sheá Brand Affidavit ¶ 1, ECF No. 21-7; Brand, Sr. Affidavit ¶ 1, ECF No. 21-8. Several plaintiffs in *Roberts II* were also South African nationals and they relied on the expert opinion of Tzvi Brivik, an experienced personal-injury attorney in South Africa, to provide evidence of the legal sufficiency of their emotional-distress claims. *See Roberts II*, Memorandum: Claims for Emotional Shock in South African Law ¶ 15, ECF No. 35-3.

According to Brivik, South African courts recognize claims "for damages caused by intentional or negligent infliction of emotional shock." *Id.* South Africa law defines "[e]motional shock" as a "shock suffered by a person without necessarily sustaining bodily injury, caused when a third party observes or is mortified by an unpleasant or disturbing event," such as "the killing of a relative or a person with whom the third party had a close emotional relationship." *Id.* ¶ 4. Such claims do not necessarily require that the plaintiff personally observe the circumstance causing the shock, *id.* ¶ 6, and "courts will exercise a wide discretion in quantifying a plaintiff's damages," *id.* ¶ 15. To prove liability for emotional shock under South Africa law, a plaintiff must show: (1) a voluntary act causing another emotional shock, (2) a causal nexus between the act and harm, (3) wrongfulness, such as a "relatively serious physical or mental harm," (4) fault, and (5) damage in the form of physical or mental harm. *Id.* ¶ 11.

The first three of these elements are subsumed within the jurisdictional analysis above. Iran voluntarily provided the proxy militias with EFPs; this support led to the EFP attacks at issue in this case; and the attacks resulted in Brand's death. There is further no question of fault since Iran is culpable of intentionally supporting such terrorism. *See supra* Part III.A. As for the significant emotional harm suffered by each plaintiff, their sworn affidavits establish this element of their claims. *See supra* Part III.D. Courts in this district have recognized that "terrorism is 'unique among the types of tortious activities'" because it is "intended to cause the highest degree of emotional distress, literally, terror.'" *Pennington*, 2021 WL 2592910, at *4 (quoting *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009)). The affidavits of Brand's immediate family members leave little doubt that this intent was realized.

## V.    DAMAGES

The Court does not have sufficient evidence before it to determine damages. Plaintiffs have accordingly requested this Court appoint a special master to determine an appropriate damages award for each plaintiff. *See* Mem. Supp. at 37, ECF No. 21-2. Under 28 U.S.C. § 1605A(e)(1), the Court may "appoint special masters to hear damage claims brought under this section." *See also* Fed. R. Civ. P. 53(a)(3). Accordingly, the Court will appoint a special master to take evidence and file a report and recommendation as to the amount of individual damages that Iran may be liable to each plaintiff.

## VI.    CONCLUSION

For the foregoing reasons, the Court holds that the motion for default judgment will be **GRANTED** in an order signed on this date against the defendant as to all issues of liability. The Court will refer this matter to a special master to make a recommendation of findings regarding the measure of compensatory damages warranted for each plaintiff, as specified in the Order

accompanying this Memorandum Opinion. The Court defers consideration of the appropriate level of punitive damages, if any, until the matter of compensatory damages becomes ripe for consideration.

Date: September 22, 2025

*Royce C. Lamberth*
Royce C. Lamberth
United States District Judge